Thank you, Your Honor. If it pleases the Court, paragraph 9 through 11 of the Hansen complaint described the mischief that is the basis of this series of lawsuits. During the relevant period of time, Morgan Stanley and the other defendants compelled, with limited exceptions, their employees and the employees' immediate family to maintain accounts and to do all of their trading through Morgan Stanley. In 2010, in apparent deference to the series of lawsuits, Morgan Stanley changed that policy and permitted the employees to do outside trading subject to their supervision. By outside trading, I mean trade with other than Morgan Stanley. Defendants Bank of America and Wells Fargo do not allow any outside trading. Now, in the complaint, which we take as true for purposes of today, we allege that Morgan Stanley charges the employees the full retail tariff for trading. That's somewhere in the $60 or $70 per transaction. That's what's alleged. While the same transaction at E-Trade or Schwab or American Trade costs about $7. So we have here literally a rip-off of 10 times the competitive price. Who's getting ripped off? The employees and their immediate families are being required to pay 10 times the competitive commission rate because they are required to deal in-house. You call that a rip-off? I think 10 times the competitive rate is a rip-off. Sounds like their clients then are getting ripped off by dealing with their employers instead of... It sounds to me like the broker should be sending them to E-Trade and Schwab. No, no, we're talking about the employees themselves. I understand that. In any event, avoiding pejoratives, they pay a much higher price being required to deal in-house than they could arrange for themselves if they were able to deal outside. Now, that's precisely the vice that Section 450 of the California Labor Code was intended to prevent. That statute, which is about a century old, said that no employer may compel or coerce any employee to patronize his or her employer in the purchase of anything of value. That's what we have here, a flat-out non-disputed violation of that statute because these three defendants in the relevant time said to the employees and to their immediate family, you must make your trades through us at the prices we charge you. Isn't the issue here conflict preemption? Excuse me, Your Honor? Isn't the issue here conflict preemption? I know how the state law works. Okay, it is conflict preemption. So with limited time, maybe you better get to the issue. We understand the case. In other words, why doesn't the SEC rule Trump 450? Isn't that what the court held? It's because the SEC did not express any preference for either method. It set up, in the best, an alternative that they could choose from. And it gave that choice to the brokerage houses. It gave that choice to the brokerage houses, yes. And the brokerage houses are able to choose whatever they think is the most effective method. Not if it violates the statute. You see, you're begging the question. Of course. The question is if the federal government, by giving the brokerage houses the discretion to choose which method, did they preempt the state law? If discretion is part of the package, the answer would appear to be yes. So why is the answer no? Not under the Williamson case. The Williamson case makes crystal clear that the mere fact that there's discretion in a statute does not automatically, if so facto, cause conflict preemption. And Williamson says, so to what do you look at if the mere fact does not? You look at, in this case, whether the SEC, which is the government, weighed in on one of these methods, and the answer is no. You look at even whether the self-regulating organizations said somewhere in the history that one of these methods is superior or better. And there is no such statement. All of the rules have this in common. They all allow outside trading. None of the rules absolutely and flatly prohibit outside trading or require in-house trading. So unlike cases... What's the objective of the rules? Pardon? What is the objective of the rules? Why are the brokerage houses... To prevent insider trading. But there's no evidence that any of them said it cannot be prevented with equal ease by monitoring outside trading. And that's in 2010. This is the remarkable thing about Judge Fisher's opinion. In 2010, Morgan Stanley changed its policy from prohibiting outside trading to allowing it. And in doing so, did they say that was going to be an equally effective way of monitoring their employees' trading? There's nothing in the record... Did they say that, or did they say they're making the change under the duress of litigation? But they need... That doesn't necessarily prove it's a better or more efficient way. They elected to limit their liability probably at the behest of their lawyers. That doesn't give them preemption. The others stood their ground. But the question here is... The legal question that you have to decide, in my view, is... By the way, Judge Fisher also found physical impossibility, but the defendants abandoned her on that. The defendants, Bank of America and Wells Fargo, concede there's no physical impossibility that you could actually comply with both the in-house and the outside trading at the same time. So we don't need to deal with that. We need to deal with the leg of conflict preemption only that says... If the taking away of the discretion is an important component in the accomplishment of the legislative objective, then there's preemption. And I submit to you, this record is just devoid of any evidence that taking away that discretion in these circumstances in any way undermines the efficacy of controlling inside trading. And I submit to you that Judge Fisher didn't spend one sentence trying to point out why, and Judge Wu didn't spend one sentence trying to point out why. They just went through a mechanical recitation relying on Geier that when you have alternatives or discretion, then taking away one of the avenues of discretion. But as Williamson pointed out, and particularly in the concurring opinion of Justice Sotomayor, the underpinning of Geier was that the federal agency weighed in and said specifically, we want this discretion. This discretion is going to promote a better CCO apparatus, it's going to promote research, it's going to promote data collection. It's specifically something we think will promote the objectives that we're trying to attain. Now in this case, nobody has said that. Nobody, and none of the judges who have ruled that there's conflict preemption can justify it. None of them can point to why this is going to interfere with the objective. And it doesn't interfere with the objective because Morgan Stanley and others, but mainly Morgan Stanley, they're doing it. They're doing it. So the discretion here simply is not critical to the regulatory objective and that's what you'd have to find. And I submit, even before Williamson, this court in the oxygenated fuel case on which Judge O'Scanlan said, reached the same conclusion that Williamson reached eight years later because in, I'll call it Davis, it's easier. In the Davis case, the court concluded that yeah, there was an option, there was a choice, there was a discretion, but it didn't go to the heart of the regulatory objective. And if it doesn't go to the heart of the regulatory objective and you can't show why eliminating the discretion undermines the regulatory purpose or objective, then there is no conflict preemption. Mr. Belushi, your co-counsel is at your side. May I take over? My name is Mark Thierman. I want to talk about the 450 California. You're the... Very well. There is no conflict preemption because there's no conflict. 450 doesn't prevent Morgan Stanley or anybody else from forcing them to have in-house accounts. 450 only prevents them from charging for it. And that's a big difference because we wouldn't be here if this case wasn't about money. This affects only... I'm sorry, just a quick question. This affects only the Morgan Stanley contention? Everybody. Everybody. Because Morgan Stanley raised the impossibility issue. Right, but it's... Frustrating purpose is there's nothing in 407 of the New York Stock Exchange rules or anything I can see in the legislative history that says you have to charge for this. In fact, if you read the legislative history of ITSA or the actual words in ITSA, it says something along the lines of maintain, enforce written policies and procedures reasonably designed taking into consideration the nature of such broker or dealer's business. There's a caveat there that the discretion is limited by the reasonableness and also by the broker and dealer's business climate or whatever and that must include state regulation. I mean, brokers are licensed by the state. Brokers take an exam by the state. So, there is a... The phrase you're talking about is nature of such broker or dealer's business? Yeah, because the business exists in Colorado differently than... The context of the business or the surroundings of the business is the nature of the business. I don't see how the business changes depending on what state you're in. Your environmental regulations, your state income tax laws, lots of things may change from state to state but that doesn't change the nature of the business. Well, there is... Then there would only be a one-size-fits-all rule here and it's not what's licensed. Different kinds of brokerage houses have different kinds of operations. But those operations are affected by where they do business. They're affected but how does that change the nature of the business? Because... Suppose you're an oil company. Environmental regulations are different in all the states but does that change the nature of the business or does it change the environmental regulatory context from state to state? Well, let's say... I don't know much about the oil business but let's say they don't allow you to do a certain kind of drilling in a certain kind of state, that changes your business. I don't think so. You're in the drilling business. You may not be able to do it but it doesn't mean you're not in the drilling business anymore. But you have to do certain things. You have to have certain manning requirements. For example, let's say they require... I don't understand nature of business to encompass everything that affects the business. And if you're trying to tell me it does, at least with me, you've got a hard sell. Well, because I'm saying it's not unfettered discretion that's reserved. Otherwise, we have a delegation by Congress to the SEC to a self-interested group then re-delegating to a definitely self-interested... Let me put... The defendant's case, as I understand it, goes like this. The goal is to cut off insider trading. Put the obligation on the employer, brokerage houses to do it. They're supposed to figure out the most effective way knowing the nature of their business, how they're structured, what kind of employees they have and so forth. Okay, brokerage houses, go do it. Right. Why doesn't that give them the discretion to figure out what's the most effective way of doing it regardless of what state law tells them they should do? Because if California requires brokers to take an exam and Colorado doesn't, they would have a different solution. I have trouble seeing how a different exam requirement is going to affect this. Well, because I guess they have different licensing requirements. I mean, I'm just taking you to an example... SEC says stop insider trading. Go figure out how to do it. And California says, fine, you can go in-house, but you can't charge them for it. Colorado says, charge them whatever you want because employees in Colorado don't have the protections of a... So California says you make them go in-house, but you can't charge them for it, so you don't have the revenue to pay the people that are supposed to be supervising the account. These accounts don't get paid for. That doesn't affect at all the effectiveness of the federal regulation, the primary goal of stopping insider trading? Well, I don't think the purpose of the regulations is to make compliance a profit center. I think there is a... To achieve compliance, but if you don't make any money on the trades, compliance may be harder to get. I mean, I'm not trying to tell you that's a factual truth, but I'm trying to say you're basically saying there's not a preemption here because it could be done, and it seems to me you do have to face the question of is it the most effective way of accomplishing the goal the federal agency set out? And I say by not charging them, you're having... There is... I mean, the trades are electronic, so the cost... And I think that's brought me some light of the co-counsel's argument about the rip-off, but in reality, other customers of Smith-Barnier or other customers of these other brokerage firms are paying for advice, and they're paying for other services that these people don't need or want. They want to be just the trade. The trade is just a matter of reallocating capital costs because it's all electronic among the number of trades that are done. So the cost of compliance, California says, that's a business expense, and you can't put business expenses on employees. That's what's the essence of these 1929 and 1935 laws is the Great Depression and not putting business expenses on employees. It's all well and good if the employee can go to a different store and get his services. The problem is the compliance obligation still remains. That is, Morgan Stanley has to supervise the trading done by this employee. Indeed, it has to supervise the trading by the employee even more than it has to supervise the trading of somebody who's not an employee. So it's not a cost-free venture for the firm. But Morgan Stanley also has to pay California income tax, and that's at a cost of doing business in California, too. For the compliance officers to be in California or the brokers to live in California, they're going to live there. They're going to have to pay California taxes. Morgan Stanley has to match it. There are all kinds of expenses of doing business in California that belong only to Morgan Stanley. Morgan Stanley can't, under California law, redistribute those costs across the board to its employees. That's the purpose of 450, not to prevent compliance. You want the employee to get the product for free because there are costs involved in supervising the employee. Well, I want the employee not to be charged for using the company's store if employees are told at Gap that they have to wear Gap clothes, they ought to be allowed to buy the Gap clothes or the people who make the Gap clothes at Mervyn's or some other place where it's cheaper. And that's all we're saying. I shouldn't use Gap clothes. Let's say Wrangler jeans or Levi jeans. I don't know. Whatever it is. There are cases like that where people in the retail trade have been told they have to wear the name brand of that store, and the result is uniform. Normally you cannot force someone to patronize the company store. You want to give them a uniform? You want to give it to them? That's fine. But they have to be able to buy it someplace else besides the company. Counsel, you're down to about two and a half minutes for your side, so I just want to just advise you of that. Thank you. I will reserve time for rebuttal. You may do so. Counsel? Good morning, Your Honors. May it please the Court. Josh Rosenkranz for Morgan Stanley Smith Barney. I'd like to start with where Judge Clifton left off, basically framing the issue. What did Congress say? What did the SEC say? They said stop insider trading. And that is really what this whole controversy is about. So what in the record tells us it can be done better the way that you want to do it? Your Honor, the record actually, let's start with the district court judge's opinion in Blumenthal on page seven, where she says that it was undisputed by the parties in Blumenthal that the ban on external accounts is the better way to more effectively address insider trading. And, of course, and we also have the SIFMA amicus brief. And there's a reason for that. I would also add that the record on pages, there are two affidavits on pages 74 and going forward and page about 185 and going, excuse me, that's wrong, pages 68 and going forward and page 177 and going forward, two affidavits that spell out why it is that Morgan Stanley and practically every other brokerage house in the country had adopted this mechanism. It is because the statute says not just detect but prevent. And the only way to prevent is if a buzzer goes off when someone trades in-house and you can catch the trading. The investigative purpose. Could you prevent if you had an advance notice requirement? That is, if they wanted to trade outside, they had to give five days notice or something of the provost trade? That would be possible, Your Honor. And all of these exotic suggestions that plaintiffs have come up with, like that one, on how they might design a brokerage compliance system if they were running one, just goes to underscore Congress's wisdom and the SEC's wisdom in leaving those decisions to the brokerage houses themselves. Let's take that example. So what you have then is within Morgan Stanley a bureau of preapproval of securities trades. So when you've got an employee who sees the stock plummeting and they're dying to sell, they have to go fill out a form with the compliance office, get preapproval, which could take days or weeks to get in a big bureaucracy. But I want to just back up to the debate that is that required for a trade within Morgan Stanley? No, Your Honor. The beauty of a trade within Morgan Stanley is people are precleared, or at least I should say barred, from trading in certain securities where they are within a danger zone. So it's actually very much pro-employee. So I hear your answer by telling me, gee, it may be disadvantageous for the employee to trade through E-Trade if they have this preapproval problem. So what? That's the employee's choice if the employee decides I've got these shares going to sell through E-Trade. That doesn't tell me why the system couldn't regulate effectively insider trading by requiring preapproval of trades outside. Well, Your Honor, so let me just back up to the purpose of the statute, which was exactly as you and Judge Trott were talking about with Mr. Bleacher, which is to allow the firms themselves to make the judgment as to what is the best way to enforce the securities laws within the context of their own business, as you were saying, Your Honor, within the idiosyncrasies of their own practices with the dangers that they've seen. And again, the undisputed record, the two affidavits that I was mentioning, go chapter and verse on all of the things that the in-house only trading requirement tallies up. For example, you can investigate much better because you don't have to go somewhere else to get the forms. You can find patterns of trading automatically through algorithms that you couldn't get on a paper statement. But again, let me just back up and disagree with Mr. Bleacher on what it is that this conflict preemption is about. The distinction between Guyer and Williamson is not about whether the federal government favors one practice over another. It's about whether the federal government favors discretion. And that is the line that distinguishes Williamson from Guyer and that this court relied on in Credit Suisse and in Che. The line more specifically is, on the one hand, a regime where federal law doesn't care whether the regulated entity has the whether the regulated entity prefers one choice over another versus, and that's Williamson, versus, on the other hand, a regime where federal law does care what the preference is of the regulated entity. And so a situation, for example, where federal law affirmatively wants the regulated entity to make the choice. I hear the other side saying, your clients can do anything they want. Just don't charge them for it, and that's why it's not impossible. That's why there's no preemption. So let me just back up and be clear. That is a response to an impossibility argument. Right. We've made an impossibility argument, but there's an obstacle preemption argument as well. Yeah, but I want to talk about the impossibility. So, Your Honor, it is impossible. So it is impossible in the same way that it was held to be impossible, that this court held it to be impossible in Credit Suisse. Credit Suisse says that when you have a federal regulation and federal law wants there to be a discretionary choice within a particular decision maker, it is impossible to comply with both a federal law that says you make the discretionary decision and a state law that takes one of the choices away and drives the decision in a particular direction. Why does it take one of the choices away? The other side says, to repeat myself, do all of this. Great. Just don't charge them. Right. So plaintiff's position. Why does that take it away? Well, so plaintiff's position is that Morgan Stanley should force employees to patronize Morgan Stanley, but don't charge them. Now, I don't see how that gets one around the 450 problem. It is still forced patronage and is still to purchase something of value. But the more important point is this. When a state imposes such a significant burden on an option that federal law wants to be available to the decision maker, that burden being to give away for free that which they charge everyone else for, that is such a significant burden that no one is going to take it. And the end result is exactly what Congress and what the regulators don't want to happen. The end result is that the Morgan Stanleys of the world decide that they will not present that option, and they go for an option B that they believe is not as good an option. Mr. Blucher, I think, said they're doing it. They're doing it. Morgan Stanley is doing it. What are they doing? Well, so what Morgan Stanley has done is to take a national policy that provides for only in-house trading and carve out the state of California and said California employees can have an exception to that policy so long as they provide the post hoc statements and confirmations. And Morgan Stanley has been clear that it believes that that is not as effective as the national plan. And by the way, I just will hasten to add. Does it make it possible? It depends on how one defines possible. It makes it possible in the sense that Morgan Stanley can claim to be abiding both by state law and by federal law, but it does not make it possible in the credit suite sense, in the sense that Morgan Stanley is no longer making the judgments case by case that Rule 407 requires or that the whole scheme requires it to make as to how to design a system. Why did Morgan Stanley do this? Well, Your Honor, the affidavits say that Morgan Stanley did this, and this is on page 69 of the Blumenthal excerpts. It did this because of the threat of overwhelming potential liability from plaintiff's class action suits. But the fact that it caved to the overwhelming potential of liability doesn't mean that it is as effectively advancing the federal interest, which is what's at issue here. Have any federal regulatory authorities weighed in on the exception that you've made for California? No, Your Honor. They have not gotten around to judging it, but that's a very important point. What happens is that this is a discretion first line of defense are the firms themselves. They're told, as Judge Clipton said, go do it. And then the second phase of the regulatory regime is the federal supervision. And the federal supervisors have said two things. First, Congress has said that they want this option available, and the legislative history is very clear that there are two options that Congress had in mind. And secondly, the regulators have said over and over again, and I'm quoting, flexibility is necessary. Autonomy is critical and foundational. And there are enforcement actions that we cite in our brief where a firm has been faulted for too liberally granting exceptions to a policy and thereby allowing people to engage in trades that ex ante at the end of the day, the federal regulators with 20-20 hindsight look back at and decide that the firm had not done everything it could have to prevent this violation. Is Morgan Stanley's California exemption anywhere on a track towards regulatory approval or scrutiny? No, Your Honor. It doesn't work that way. It's always post hoc. It's not ex ante, please approve this and bless this. What happens is when there is a chink in the armor. I want to ask, has there been a chink in the armor such as to get you on that track? Thank goodness so far, no, Your Honor, not that we know of. But what happens is the regulators go look backwards after someone discovers a securities fraud violation insider trading. The crime may be committed at this very moment. We won't know about it for a while. We just don't know, Your Honor. That is correct. And the Credit Suisse case, that is the regulatory case, is a really good example. A $3 million violation which escaped the notice of the firms. And one of the things that the regulators noted in mitigation was that Credit Suisse went back and the other brokerage firms went back and fixed their program to make sure that there were fewer exceptions. Is there any way Morgan Stanley could have, before it had actually put this California exception in place, gone to the regulators to seek prior approval? I don't know that there's any mechanism for that, Your Honor. The record does not reflect such a mechanism. They don't give advisory opinions. It's called supervised self-regulation. And the reason is that the firms themselves are the first line of defense, and the regulators come in when they found a chink. Counsel, you're down to about seven and a half minutes for your side. Yes, Your Honor. I just mentioned that deeply into my colleague's time. If there are no further questions, let me just. I feel like a lineman right now. Let me just wrap up with this. Congress said that the brokerage firms should decide, not the states, not plaintiffs, wielding idiosyncratic and vague state statutes, and not former employees, and certainly not the courts. And so the district court was correct in saying that the plan that plaintiffs have put forward to substitute their judgment or a court's judgment for Morgan Stanley's does conflict with federal law. If your side wins this case, will you get rid of the California exemption? Almost absolutely, Your Honor. I can see a head-shaking yes from the gallery. Thank you, Your Honors. Thank you, Counsel. Thank you, Your Honors. May it please the Court, Malcolm Heineke from Unger, Tolson, Olson. On behalf of defendants Wells Fargo and Bank of America, I will note I'm from the San Francisco office, so the lineman reference still has a little sting for me. I will try to get over it to argue here. Mr. Rosenkranz did a wonderful job presenting the case, and I will simply say this, that the issue of the discretion and the issue of the choice of external trading restrictions was a choice purposefully left to the brokerage houses for the very reasons Your Honor cites. And on this point, I think it's critical to note that the law itself, the legislative history of the congressional law and the SRO rules, don't just give this discretion without any guidance. External trading restrictions were one of the two minimum standards identified by Congress. So here, this is not a situation where we have perhaps abuse of unfettered discretion. We have my clients, Mr. Rosenkranz's clients, if you'll let him, adopting not only what they believe to be the most effective way to prevent insider trading, but one that Congress itself identified. And here's where we really need to think about the practicalities. This is in the record in the SIFMA brief, and it's really an undisputed point. To your comment, just as I took the bench, Your Honor, we don't know what's going on. We live in a world of electronic trading. Transactions are being made 24-7, and without the ability to control those trades in real time, electronically, and most importantly, prescriptively, we lose the ability to prevent abuses. That's why brokerage houses have been given this discretion. Plaintiffs try to make the Williamson side of the Williamson-Geyer distinction or dichotomy. The Williamson case says that when discretion is granted not for the purpose of serving the regulatory objective, then there may not be preemption. That is not the case here. The record could not be clearer that the federal government gave brokerage firms this discretion so that they could design the most effective method and thereby serve the underlying objective. Has any brokerage house chosen the alternative? Has any brokerage house chosen not to require employees to trade through the house? I haven't done a survey of all of the brokerage houses, and I suspect that the external trading restrictions may not be applied at smaller brokerage houses that perhaps don't have electronic trading platforms and don't have the large systems that we have. But here, you have before you three of the largest brokerages in the country, and all of them, given their druthers, would choose external trading restrictions because they believe those to be most effective. Morgan Stanley has, in the face of litigation pressure, gone to what it believes to be the second most effective, but that proves the point, Your Honor. The application of state law, even in the form of threatened litigation, as the plaintiffs would have this court and the district courts apply it, burdens that discretion. It would force, in some instances, even by threat, the brokerage houses to adopt what they believe to be the second best restriction. I'm trying to figure out the policy interest in providing discretion. Because on one level, it seems sort of like a no-brainer. You can supervise things better if it's all within house. But that's not what was imposed. And so, I guess I'm trying to figure out why was the alternative made available to brokerage houses. Because brokerage houses differ, and it's important to think about the industry as a whole, and I would urge you to read the SIFMA brief which addresses this. Here, you have three large brokerage firms, all with sophisticated electronic trading platforms where the sorts of external trading restrictions and focus restrictions internally will work. It is possible that there may be a smaller firm where that won't work. It is possible that there's another large brokerage firm that, for whatever reason, thinks reporting on external trading will be most effective. But that's not the key. The key isn't what's hypothetical. The key is what happened. And what happened is the federal government gave discretion to these brokerage houses to pick what's best for them. It seems to me they were trying to avoid the trap of one size fits all. You get into a monstrous mess if you start trying to do that. Well said, Your Honor. That's what was going on. We have a situation where every brokerage house knows how its systems work and so how it can best apply prophylactic measures to those systems to prevent insider trading. If you force one thing, perhaps external trading restrictions, perhaps after the fact reporting, that may not work effectively. It is part and parcel of the overall self-regulation of the securities industry, and here there's been a clear exercise or, you know, decision to give discretion to the brokerage firms to make this decision themselves. Finally, I will say to Mr. Thierman's argument that the brokerage houses can simply give the charges away for free, excuse me, the trades away for free. Mr. Rosenkranz addressed this briefly. That doesn't solve the Section 450 problem. If we were to force our brokers to stay on our platform so that we could monitor them as we think is the most effective way, we would still be forcing them to patronize our firm in the purchase of something of value, which, of course, is the securities. Second and perhaps most important. You're not facing much of a damage claim, though. Excuse me? Might not be facing much of a damage claim. Well, from the plaintiffs, we might be facing a real problem from the, you know, the regulators if because we've had this discretion taken away from us or because we've had it interfered with, we went with a separate or second or less effective program, then we'd be facing that problem. And that really brings me to the point, which is even when they're arguing we have to give this thing away for free, it's essentially imposing a penalty, a financial penalty. As Your Honor noted, there's costs of compliance, and if there is a ruling that says California law penalizes financially firms for adopting what they think is the best trading restriction and what Congress identified specifically as a minimum trading restriction and most importantly what Congress gave them the discretion through the SEC and the SROs to adopt, we have obstacle preemption. That's why our briefs focus on the obstacle preemption issue, not the impossibility preemption issue. Mr. Rosenkranz's argument doesn't raise objection with us. We think you could phrase it one way that it's impossible, but either way, it is clear that the effort of the plaintiffs here significantly burdens the discretion of the brokerage firms given to those brokerage firms by the federal government for the regulatory purpose. I see my time is about to expire. Your time has expired. Thank you, Counsel. I see it has expired. Thank you, Your Honors. We'll hear from Mr. Bleacher. You have some reserve time, Mr. Bleacher. I want to make four discrete points, and hopefully I can do it in about a minute and a half. The first is, Judge Clifton, you keep saying, and I'm going to take you on, that there's something implicit in here in finding the best way. That's not what Congress said at all. If you look at tab 9 to our brief, and you look at the legislative history of the act they adopted in 1988, they said they wanted the industry to maintain and enforce written policies, quote, reasonably designed, reasonably designed to prevent misuse. So they didn't say pick the absolute best system. So the federal regulators really don't care if they use a system that's not the most effective? I think they care, but for preemption purposes, my second point, if you go to Davis, because I can't pronounce the fuel word, in Davis, this court said there has to be clear evidence that the conflict would undermine the congressional purpose. Now, we know what the congressional purpose is, and we know that they said you could find reasonable ways, and they came up with an alternative, and you can carry water on both shoulders. The brokerage house could let the employees deal with the brokerage house if that's their choice, or they could let them deal outside if that's their choice. And the obligation, as I see the congressional intent, is for the brokerage house to set up written policies and procedures in either case which will protect against inside traders or any other kind of fraud. That's their obligation. It doesn't say that either method has to be adopted exclusively. Remember, if you will, please, that we're dealing with, and this court has said it, and the Supreme Court has said it, that when you're looking at the police power of the state, there is a strong presumption against preemption, a strong presumption. So we shouldn't be assuming that the statute requires preemption in order to find what they tell you is the best method and in which there is no, quote, clear evidence. The self-serving declarations of the stockbroker houses is not a substitute for the Securities and Exchange Commission weighing in, and they haven't weighed in to answer your question. They have not weighed in, and there is no clear evidence here that any kind of preemption is necessary to achieve the legislative objective. Thank you, counsel. The case just argued will be submitted for discussion.
judges: O'scannlain, Trott, Clifton